UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHIGAN STATE AFL-CIO; UTILITY
WORKERS UNION OF AMERICA, AFL-CIO,
LOCAL 223; GEORGE HORUCZI; INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS,
AFL-CIO, LOCAL 58; MICHIGAN STATE UTILITY
WORKERS COUNCIL; and WILLIAM D.
CHADWICK, JR.,

      Plaintiffs,       Civil Case No. 16-11454
                 Honorable Linda V. Parker

v.

RUTH JOHNSON, in her official capacity as
MICHIGAN SECRETARY OF STATE; and
WILLIAM SCHUETTE, in his official capacity
as MICHIGAN ATTORNEY GENERAL,

      Defendants.
_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

A recent amendment to the Michigan Campaign Finance Act ("MCFA"),

effective January 6, 2016, makes it a felony for corporations to use payroll

deduction for contributions to a separate segregated fund not established by the

corporation or connected to a nonprofit corporation of which the corporation is a

member.  Mich. Comp. Laws § 169.254(3).  Claiming this amendment violates

their rights under the United States Constitution, labor unions and their members

filed this lawsuit on April 22, 2016.  Plaintiffs moved for a preliminary injunction

on May 5, 2016.  (ECF No. 7.)  The motion has been fully briefed (ECF Nos. 18,

22) and the Court held a motion hearing on June 15, 2016.  For the reasons that

follow, the Court grants the motion.

## I.    Factual and Procedural Background

The MCFA regulates the raising and spending of money in campaigns for

Michigan elective office.  Under the MCFA, unions and corporations, as well as

other regulated entities, may not contribute their treasury money directly to a

candidate committee.  Mich. Comp. Laws § 169.241(1).  A knowing violation of

this prohibition is a felony punishable by a fine of up to $10,000.  *Id*. § 169.254(4).

In lieu of direct contributions, unions and corporations may arrange for

contributions to candidates by establishing and operating a separate political

committee, called a "separate segregated fund" ("SSF").  Many unions maintain an

SSF to fund the union's participation in the political and legislative process,

thereby voicing and advancing the interests of its members.  (*See, e.g.,* Cianfarani

Decl. ¶ 2, ECF No. 7-2; Richard Decl. ¶ 3, ECF No. 7-3.)

The MCFA imposes limits and conditions on how contributions to an SSF

may be collected.  Contributions must be voluntary.  The MCFA provides that

force, coercion, or threats of reprisal or loss of employment may not be used in the

solicitation of contributions.  Mich. Comp. Laws § 169.255(6).  Violation of this

provision constitutes a felony.  *Id*. § 169.255(8).  Moreover, the MCFA was

2

amended in 1994 to require corporations and labor unions to obtain affirmative

consent at least once per year from members contributing to an SSF by means of

an automatic payroll deduction.  Mich. Comp. Laws § 169.255(6).[1]

The MCFA specifically permits the use of payroll deduction (commonly

called "PAC check-off") as a method for collecting voluntary contributions from

employees toward an SSF.  The employee is required to give written authorization

to his or her employer to deduct and remit a specified portion of the employee's

wages with each payroll to an SSF.  *See* Mich. Comp. Laws § 169.255(6).  Payroll

deduction for a union member requires the cooperation of the member's employer,

as Michigan law does not require an employer to provide payroll deduction.

Unions often secure promises from employers to provide PAC check-off for its

members in collective bargaining agreements ("CBAs").  *See id.* § 408.477(1).

Plaintiff Utility Workers Union of America, AFL-CIO, Local 223 ("Local

223") maintains an SSF under Michigan law entitled the "Local 223 UWUA PAC

Fund" ("Local 223 PAC").  (Cianfarani Decl. ¶ 2, ECF No. 7-2.)  Similarly,

Plaintiff International Brotherhood of Electrical Workers, AFL-CIO, Local 58

("Local 58") maintains an SSF under Michigan law entitled "the Local 58 IBEW

PAC" ("Local 58 PAC").  (Richard Decl. ¶ 3, ECF No. 7-3.)  Local 223 and Local

---

[1] This requirement was removed with the amendments to the MCFA now
challenged.

3

58 members contribute to their union's PACs by consenting to have their employers deduct contributions from their wages through payroll deduction.  (*Id.*; Cianfarani Decl. ¶ 5.)  Their employers have agreed to this process in CBAs between the employers and the unions.  (Richard Decl. ¶ 3; Cianfarani Decl. ¶ 4.)

For example, an agreement for PAC check-off is included in the current CBA between Local 223 and DTE Electric Company, DTE Gas Company, and DTE Corporate Services LLC (collectively "DTE Energy"), as it has been in their several previous CBAs.  (Cianfarani Decl. ¶ 4, ECF No. 7-2; *see also* Ex. 1 § 1.5.a.4.)  The current CBA is effective March 23, 2013 through October 9, 2017, with respect to certain bargaining unit employees, and through June 5, 2017, with respect to other bargaining unit employees.  (Cianfarani Decl. ¶ 3.)  During 2015, Local 223 members contributed approximately $4,000 to the Local 223 PAC through DTE Energy's payroll deductions.  (*Id.* ¶ 6.)

Similarly, for the past three decades, Local 58 has negotiated a payroll deduction, or PAC check-off, procedure for contributions by its members in its CBAs with members' employers.  (Richard Decl. ¶¶ 3, 4, ECF No. 7-3; *see also* Ex. A at 7.)  For example, Local 58 and Telecom Technicians, Inc. ("TTI") entered into a CBA, effective May 1, 2014 to April 30, 2017, in which TTI agrees to remit contributions on behalf of bargaining unit members to the Local 58 PAC.  (*Id.*)  In 2015, the Local 58 PAC received $38,920.31 through payroll deductions made

4

pursuant to the CBAs between Local 58 and its members' employers.  (*Id*. ¶ 9.)
This constitutes approximately 58% of the funds contributed to the SSF overall.
(*Id*.)

On October 20, 2015, a bill was introduced in the Michigan Senate to make
certain amendments to the MCFA.  (*See* Pls.' Mot., Ex. C, ECF No. 7-4.)  These
amendments included removing the annual consent requirement for automatic
payroll deduction contributions to an SSF and permitting a connected organization
to collect and commingle SSF contributions with other general assets and later
transmit the contributions separately to the SSF if certain requirements were met.
The bill passed unanimously and was sent to the Michigan House of
Representatives.  (*Id*., Ex. E, ECF No. 7-6.)

At around 10:00 p.m. on December 17, 2015, the last day of the 2015
legislative calendar, Representative Lisa Lyons introduced a floor substitute bill
that expanded the original Senate Bill from twelve to fifty-three pages.  (*Id*., Exs.
F, G. ECF Nos. 7-7, 7-8.)  The substitute bill added several new amendments.  (*Id*.,
Ex. F, ECF No. 7-7.)  It passed the House apparently without any substantive
debate.  (*See id*., Ex. H at 2222-2223, ECF No. 7-9 at Pg ID 198-99.)  The bill
returned to the Senate late that evening and passed by a vote along party lines.
(*Id*., Ex. K at 2070-2084, ECF No. 7-12 at Pg ID 220-34.)  Senate Democrats, and
even some Senate Republicans, complained that they had no opportunity to read

the amended bill and had no idea what amendments were made in the House. (*See id*., Exs. G, K at 2084, M, ECF Nos. 7-8. 7-12, 7-14.) One of those amendments provides as follows:

> Except for expenditures made by a corporation in the ordinary course of its business, an expenditure made by a corporation to provide for the collection and transfer of contributions to another separate segregated fund not established by that corporation, or to a separate segregated fund not connected to a nonprofit corporation of which the corporation is a member, constitutes an in-kind contribution by the corporation and is prohibited under this section. Advanced payment or reimbursement to a corporation by a separate segregated fund not established by that corporation, or by a separate segregated fund not connected to a nonprofit corporation of which the corporation is a member, does not cure a use of corporate resources otherwise prohibited by this section.

Mich. Comp. Laws § 169.254(3). The bill was enrolled as 2016 Public Act 269 ("PA 269").

PA 269 was presented to Michigan Governor Rick Snyder on December 28, 2015, who signed it on January 16, 2016. PA 269 went into effect on that date.

By its express terms, PA 269 allows corporations to use payroll deduction for contributions to its own SSFs or the SSFs of a nonprofit corporation of which the corporation is a member. Mich. Comp. Laws § 169.254(3). It prohibits corporations, however, from using payroll deduction for contributions to any other SSFs. *Id*. The statute makes the knowing violation of this provision a felony subject to a fine of not more than $5,000.00 or imprisonment for up to three years, or both. *Id*. § 169.254(5).

6

Subsequent to PA 269's passage, DTE Energy informed Local 223 that, because of the statute, it no longer would administer PAC check-off contributions for the Local 223 PAC. (Cianfarani Decl. ¶ 6, ECF No. 7-2.) Local 58 has begun contract negotiations for its largest multi-employer contract with the Southeastern Michigan Chapter of the National Electrical Contractors Association ("NECA"), covering some 3,000 union members. (Richard Decl. ¶ 9, ECF No. 7-3.) At the bargaining table, NECA's bargaining representative has indicated that NECA will not continue to agree to PAC check-off because it is unlawful under PA 269. (*Id*.)

The unions find payroll deduction to be the most feasible and effective method of collecting contributions from its members. (*See id*. ¶ 12; Cianfarani Decl. ¶ 8, ECF No. 7-2.) Rudy Cianfarani, a DTE Energy employee and a member and officer of Local 223, indicates that in soliciting political contributions for the Local 223 PAC, he has found members to be "very reluctant to use automatic bank transfers or credit card withdrawals[]" due to their "concerns for security and privacy." (*Id*.) Cianfarani further indicates that, "at this point in time, it will be practically impossible to meet with members individually to seek contributions before the end of this election cycle. (*Id*. ¶ 9.)

Michael Richard, Business Manager and Financial Secretary of Local 58, provides that "[b]ecause PA 269 was passed without warning, Local 58 did not have time to set up additional or alternative electronic methods for contributions

7

[to the Local 58 PAC]." (Richard Decl. ¶ 11, ECF No. 7-3.) Richard further declares that, based on his interactions and discussions with the union's membership, "the vast majority of members hesitate to use other methods to make contributions through third parties such as automatic bank transfers or credits cards, because they are concerned with issues such as identify theft." (*Id*. ¶ 12.) Members prefer making SSF contributions through payroll deduction because then they only pay when they are working and not when they are laid off or otherwise not working. (*Id*.) Richard also indicates that, "[d]uring this election cycle, it will be logistically impossible to communicate with all of [the union's] members to ask for contributions . . . and put in place alternative systematic methods of collecting contributions[.]" (*Id*. ¶ 13.)

Local 223 and Local 58, along with the remaining Plaintiffs, therefore filed this lawsuit challenging the constitutionality of PA 269 on April 22, 2016. (Compl., ECF No. 1.) Specifically, in Count I of their Complaint, Plaintiffs assert that PA 269 constitutes "viewpoint discrimination" in that it prohibits corporations from using PAC check-off for union SSFs while permitting its use for the SSFs of corporations and nonprofit corporations of which the corporation is a member, such as trade associations like the Michigan Chamber of Commerce. (*Id*. ¶¶ 43-48.) Plaintiffs further assert in Count II of their Complaint that PA 269 unconstitutionally infringes their First Amendment rights to free speech and

association.  (*Id*. ¶¶ 49-53.)  Plaintiffs raise an Equal Protection Clause claim in Count III, contending "[t]here is no rational basis for PA 269's selective and discriminatory application to certain speakers and not others . . .."  (*Id*. ¶¶ 54-56.) Lastly, in Count IV, Plaintiffs allege that PA 269 substantially impairs existing CBAs in violation of the Constitution's Contract Clause.  (*Id*. ¶¶ 57-60.)

As indicated, Plaintiffs filed a motion for preliminary injunction on May 5, 2016, asking the Court to enjoin the State from enforcing PA 269.  (ECF No. 7.) Defendants filed a response brief on May 26, 2016, contending that Plaintiffs' claims are barred by laches and fail on their merits.[2]  (ECF No. 18.)  Plaintiffs filed a reply brief on June 9, 2016.  (ECF No. 22.)

---

[2] Defendants open their legal argument in opposition to Plaintiffs' motion asserting their laches argument.  As the Court stated at the motion hearing, it found Defendants' decision to start with this argument surprising.  Laches bars a claim if: (1) the plaintiff unreasonably delayed in asserting his or her rights; and (2) prejudice results to the defending party. *Brown-Graves Co. v. Central States, S.E. & S.W., Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000).  In the present case, there was no unreasonable delay.  Moreover, the only prejudice Defendants claim resulting from any delay is that "[w]hile staff at the Secretary of State prepare for the August primary and November general elections, they must turn their attention to an 'emergency' that Plaintiffs claim must be addressed now.  Yet this 'emergency' is in large part a self-created emergency."  (Defs.' Resp. Br. at 9, ECF No. 18 at Pg ID 301.)  This Court finds specious Defendants' assertion (notably unsupported by any evidence) that this litigation is demanding the time or attention of the staff at the Secretary of State or is distracting from their ability to prepare for the upcoming primary and elections.

9

## II.      Preliminary Injunction Standard

A court must balance four criteria in deciding whether to issue a preliminary

injunction:

> "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harms to others; and (4) whether the public interest would be served by the issuance of the injunction."

*Bailey v. Callaghan*, 715 F.3d 956, 958 (6th Cir. 2013) (quoting *Hunter v.*

*Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011)) (brackets

omitted).  " 'When a party seeks a preliminary injunction on the basis of a potential

constitutional violation, the likelihood of success on the merits will often be the

determinative factor.' " *Id.* (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436

(6th Cir. 2012)).

## III.     Applicable Law and Analysis

### A.      Plaintiffs' Likelihood of Success on the Merits

#### 1.      Viewpoint Discrimination

The First Amendment, applicable to the States through the Due Process

Clause of the Fourteenth Amendment, provides that "Congress shall make no law

… abridging the freedom of speech … or the right of the people peaceably to

assemble."  U.S. Const. amend. I; *Michigan State AFL-CIO v. Miller*, 103 F.3d

1240, 1250 (6th Cir. 1997) (citing *44 Liquormart, Inc. v. Rhode Island*, 517 U.S.

484, 489 n.1 (1996)).  In a long line of cases, the Supreme Court has recognized

that First Amendment protection extends to corporations and other associations,

like unions.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010)

(citing cases); *see also Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*,

475 U.S. 1, 8 (1986) ("The identity of the speaker is not decisive in determining

whether speech is protected.  Corporations and other associations, like individuals,

contribute to the discussion, debate, and the dissemination of information and ideas

that the First Amendment seeks to foster.") (internal quotation marks and citation

omitted); *see also Brown v. Alexander*, 718 F.2d 1417, 1422 (6th Cir. 1983)

(citations omitted) ("[W]e acknowledge that first amendment protections extend to

labor union activities and the right of employees to associate together as a labor

union.").

   "The First Amendment 'has its fullest and most urgent application' to speech

uttered during a campaign for political office."  *Citizens United*, 558 U.S. at 339-

40 (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 265,

272 (1971)) (additional quotation marks and citation omitted).  As the Supreme

Court has emphasized on numerous occasions, "[p]olitical speech is 'indispensable

to decisionmaking in a democracy[.]"  *Id.* at 349 (quoting *First Nat'l Bank of*

*Boston v. Bellotti*, 435 U.S. 765, 777 (1978)); *see also Buckley v. Valeo*, 424 U.S.

1, 15 (1976) (quoting *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) (" '[I]t

11

can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.' ") "The First Amendment protects political association as well as political expression." *Buckley*, 424 U.S. at 15 ("[T]he First and Fourteenth Amendments guarantee 'freedom to associate with others for the common advancement of political beliefs and ideas[.]' ") (quoting *Kusper v. Pontikes*, 414 U.S. 51, 56 (1973)). " '[E]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.' " *Id*. (quoting *NAACP v. Alabama*, 357 U.S. 449, 460 (1958)).

The government may violate the First Amendment if it regulates speech because of disapproval of the ideas expressed. "Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citing cases); *see also Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."). Viewpoint discrimination occurs when the government restricts speech "based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id*. (citing

12

*R.A.V.*, 505 U.S. at 391); *see also Citizens United*, 558 U.S. at 340 ("The First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited too, are restrictions distinguishing among different speakers, allowing speech by some but not others.  As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Id*. (citation omitted).

On its face, PA 269 does not treat contributions toward SSFs through payroll deduction the same.  It allows a corporation to use payroll deduction to contribute funds to the SSFs of the corporation and non-profit corporations of which it is a member, but bans the use of payroll contributions to fund all other SSFs, such as those of a union.  In that significant respect-- as well as others discussed below-- PA 269 is distinguishable from the statutes at issue in *Ysursa v. Pocatello Education Association*, 555 U.S. 353 (2009), and *Bailey v. Callaghan*, 715 F.3d 956 (6th Cir. 2013).  As the Supreme Court observed in *Ysursa* with respect to the Idaho statute before it: "The ban on political payroll deductions is by its terms not limited to any particular type of political contribution.  Nothing in the record suggests that public employers permit deductions for some political activities but

13

not for those of unions." 555 U.S. at 361 n.3. In *Bailey*, the Sixth Circuit Court of Appeals found that Michigan's Public Employment Relations Act, which prohibited public school employers from collecting union dues through payroll deduction, "does not discriminate against or even mention viewpoint." [3] 715 F.3d at 960.

Nevertheless, Defendants read *Ysursa* and *Bailey* as instructing that payroll deduction is not speech. They therefore argue the First Amendment is not implicated in PA 269's ban. In support, Defendants rely on *Bailey*'s description of the payroll deduction process as simply a "ministerial act of deducting a particular sum from an employee's paycheck[.]" 715 F.3d at 959.

That deduction, however, is pursuant to the employee's assignment of a portion of his or her wages to a particular entity, organization, or cause. Thus, a ban on payroll deductions does not simply prohibit an employer from engaging in a ministerial act, it precludes employees from using this efficient and secure process to assign their wages to fund certain activities. Further, it precludes PACs from raising funds necessary to engage in political speech. While payroll deduction may not constitute expressive activity, *see Bailey*, 715 F.3d at 959, longstanding

---

[3] Although the majority in *Bailey* concluded that the statute at issue was viewpoint neutral, Judge Stranch dissented, disagreeing with that conclusion after "ferret[ing] out" the legislature's hidden viewpoint bias. 715 F.3d at 965-66 (Stranch, J., dissenting). This Court need not undertake such a task, as PA 269, on its face, allows payroll deductions for some SSFs, while prohibiting it for others.

14

Supreme Court precedent teaches that the act of soliciting or spending funds to promote speech is entitled to First Amendment protection. *Citizens United*, 558 U.S. at 361 (addressing a ban on "independent expenditures" by corporations); *Buckley*, 424 U.S. at 19 ("A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating in today's mass society requires the expenditure of money."); *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 787-88 (1988) (overturning restrictions on charitable fundraising, stating, "the solicitation of charitable contributions is protected speech."); *Meyer v. Grant*, 486 U.S. 414, 424 (1988) (striking down Colorado law that prohibited paying individuals to circulate petitions to qualify ballot initiatives).[4] And before *Bailey*, the Sixth Circuit Court

---

[4] Notable with respect to Defendants' argument that there are alternative methods for unions to solicit and collect member contributions for union PACs, the Court in *Meyer* stated:

> That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse. That it leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression.

(Cont'd . . .)

of Appeals recognized PAC check-off as worthy of First Amendment protection. *See Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1250 (6th Cir. 1997) ("[P]laintiffs allege that the annual consent requirement [requiring labor unions to obtain affirmative annual consent from members utilizing an automatic payroll deduction to make contributions to their union for political purposes] unduly interferes with their right to solicit funds for the furtherance of protected speech, *an activity recognized as falling within the scope of the First Amendment*.") (emphasis added).  The opinion Justice Roberts wrote for the Court in *Ysursa* supports this conclusion.

As enacted, Idaho's ban on payroll deduction for political activities applied to state and local employers, *as well as* private employers.  *See Pocatello Educ. Ass'n v. Heideman*, No. CV-03-0256, 2005 WL 3241745, at *1 (D. Idaho Nov. 23, 2005) (unpublished).  The District Court for the District of Idaho held the ban unconstitutional as applied to local employers and private employers.  *Id*. at *3-4. The court's holding with respect to private employers was not challenged on appeal, *see Pocatello Educ. Ass'n v. Heideman*, 504 F.3d 1053, 1056 (9th Cir. 2007); and as the Ninth Circuit Court of Appeals noted, "[t]he parties appear[ed] to agree" that the law violated the First Amendment "with respect to the payroll deductions of private employers."  *Id*. at 1059 n.4.  Concurring in the Supreme

_____

486 U.S. at 424.

16

Court's decision in the case, Justice Ginsburg noted this agreement and therefore pointed out that "the sole question posed for th[e] Court's decision is the appropriate placement of the State's political subdivisions . . .." *Ysursa*, 555 U.S. at 364-65 (Ginsburg, J., concurring). Obviously, if payroll deduction is not entitled to First Amendment protection (as *Bailey*'s broad language suggests and Defendants argue), and if payroll deduction does not invoke the rights of the employees whose wages are being deducted or the unions receiving those funds (as Defendants argue), there would have been no need for the Supreme Court to analyze whether a ban on such deductions at the local government level is distinguishable from a ban at the state level. The Court's decision is dependent upon this analysis, however. *Id*. at 362.

The majority decision in *Ysursa* further instructs that restrictions on payroll deduction based on an excluded party's disfavored viewpoint *can* infringe the First Amendment. In response to Justice Breyer's concern that Idaho's ban on payroll deduction might be applied inequitably, the *Ysursa* majority reiterated that the law "is by its terms not limited to any particular type of political contribution." 555 U.S. at 361 n.3 But the Court advised, "[i]f the ban is not enforced evenhandedly, plaintiffs are free to bring an as-applied [First Amendment] challenge." *Id*. (citing *Finley*, 524 U.S. at 587).

Supreme Court precedent teaches that, even where the government is not required to subsidize speech, it may not engage in viewpoint discrimination. *See, e.g., Rosenberger*, 515 U.S. at 834 ("Although acknowledging that the Government is not required to subsidize the exercise of fundamental rights, we affirmed [in *Regan v. Taxation With Representation*, 461 U.S. 540, 545-46 (1983)], the requirement of viewpoint neutrality in the Government's provision of financial benefits by observing that 'the case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to aim at the suppression of dangerous ideas.' ") (quoting *Regan*, 461 U.S. at 548). In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Court reiterated its earlier pronouncements regarding the restriction on the government's ability to leverage its power or laws to favor certain viewpoints over others:

> We have stated that, even in the provision of subsidies, the Government may not "ai[m] at the suppression of dangerous ideas," *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 550, 103 S. Ct. 1997, 2003, 76 L.Ed.2d 129 (1983) (internal quotation marks omitted), and if a subsidy were "manipulated" to have a "coercive effect," then relief could be appropriate. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 237, 107 S. Ct. 1722, 1731–1732, 95 L. Ed. 2d 209 (1987) (SCALIA, J., dissenting); *see also Leathers v. Medlock*, 499 U.S. 439, 447, 111 S. Ct. 1438, 1443, 113 L. Ed. 2d 494 (1991) ( "[D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints"). In addition, as the NEA itself concedes, a more pressing constitutional question would arise if Government funding resulted in the imposition of a disproportionate burden calculated to drive "certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v.*

> *Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.
> Ct. 501, 508, 116 L.Ed.2d 476 (1991) . . ..

*Finley*, 524 U.S. at 587.  PA 269 thus constitutes unlawful viewpoint

discrimination if the ban "result[s] in the [State's] imposition of a disproportionate

burden calculated to drive 'certain ideas or viewpoints from the marketplace.' "  *Id.*

at 587 (quoting *Simon & Schuster*, 502 U.S. at 116).

As mentioned above, *Ysursa* and *Bailey* are distinguishable from the present

case because the statutes at issue in those cases "appl[y] to all organizations, to any

deduction regarding political issues, apply[y] regardless of viewpoint or message,

appl[y] to all employers, and . . . do[] not single out any candidates or issues."

*Ysursa*, 555 U.S. at 361 n.3 (internal quotation marks and citation omitted); *see*

*also Bailey*, 715 F.3d at 959.  The cases also are significantly distinguishable in

that the provisions challenged before the Supreme Court in *Ysursa* and the Sixth

Circuit Court of Appeals in *Bailey* banned only *public* employer payroll deduction

for political activity.  *Ysursa*, 555 U.S. at 355; *Bailey*, 715 F.3d at 957.  As such,

both cases fall within "a narrow class of speech restrictions" upheld by the

Supreme Court.  *Citizens United*, 558 U.S. at 341.

The holdings in *Ysursa* and *Bailey* were premised on the principle that

"[w]hile in some contexts the government must accommodate expression, it is not

required to assist others in funding the expression of particular ideas, including

political ones."  *Ysursa*, 555 U.S. at 358; *Bailey*, 715 F.3d at 958 (quoting *Ysursa*,

19

555 U.S. at 355) (" 'The First Amendment prohibits government from 'abridging the freedom of speech'; it does not confer an affirmative right to use *government payroll mechanisms for the purpose of obtaining funds for expression.*' ") (emphasis added).  *Ysursa* and *Bailey* simply stand for the unremarkable proposition that the First Amendment does not impose an affirmative obligation on the States to assist individuals or entities in the exercise of *their right* to solicit funds-- a right which the Sixth Circuit has recognized is a central First Amendment right.  *See Mich. State AFL-CIO*, 103 F.3d at 1251 ("The Secretary of State asserts that the annual consent requirement is necessary to preserve the right of individuals not to contribute to the advocacy of a political message, *a right accorded the same constitutional status as plaintiffs' right to solicit political funds*.").  In other words, *Ysursa* and *Bailey* make clear only that the right of an individual or entity to solicit or contribute funds for political activity is outweighed by "the State's interest in avoiding the appearance that carrying out the public's business is tainted by partisan political activity."  *Ysursa*, 555 U.S. at 355.

In short, the Court finds that by enacting PA 269, Michigan has placed an obstacle-- bolstered by the threat of a felony charge-- in the path of organizations' and employees' efforts to solicit and raise funds necessary to engage in political speech.  The Court further finds that this obstacle does not apply evenhandedly. As such, the statute is unconstitutional unless it "furthers a compelling

[governmental] interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340.  Stated differently, Defendants "must specifically identify an actual problem in need of solving, . . . and the curtailment of free speech must be actually necessary to the solution[.]" *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (internal quotation marks and citations omitted).

Defendants assert that PA 269 furthers the following governmental interests: (1) "to preserve the purity of elections" and "to guard against abuses of the elective franchise"; (2) "to combat the risk of actual *quid pro quo* corruption or the appearance of such corruption"; and (3) "to preserve the right of individuals not to contribute to the advocacy of a political message . . .."  (Defs.' Resp. Br. at 18, ECF No. 18 at Pg ID 310, internal quotation marks and citations omitted.)  The Court will assume for purposes of this motion that these are "actual problems" associated with voluntary PAC check-off (although Plaintiffs make persuasive arguments for why they are not).  PA 269's underinclusiveness, however, leads the Court to believe that the statute was not adopted to solve these "problems."

PA 269 does not prohibit payroll deduction for the benefit of all entities. Specifically, in addition to the SSFs of the corporation making the payroll deduction, the statute allows for deductions for contributions to the SSFs of separate, non-profit corporations of which the deducting-corporation is a member, such as the Michigan Chamber of Commerce.  Defendants have not attempted to

21

explain why such non-profit corporations are entitled to more favorable treatment than unions, or why the problems PA 269 allegedly was enacted to resolve do not arise when payroll deduction is used to fund the SSFs of those entities.  As a result, PA 269 is underinclusive when judged against its asserted justification. "Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."  *Brown*, 564 U.S. at 802 (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994); *Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989)).

Additionally, Defendants' asserted interest in protecting the rights of employees not to contribute to the advocacy of a political message is underscored by the legislature's elimination of the annual consent requirement when amending the MCFA in late 2015.  Moreover, PAC check-off is voluntary, requiring an employee's "affirmative[] consent[]" to the contribution before deductions can be initiated.  Mich. Comp. Laws § 169.255(6).  Employees disagreeing with some or all of their unions' political positions can choose to withdraw their consent.

In short, PA 269 cannot survive strict scrutiny and thus the Court finds a strong likelihood that Plaintiffs will prevail on their claim that the statute effectuates viewpoint discrimination in violation of the First Amendment.  But even if Plaintiffs are not likely to prevail on their First Amendment claim, the

22

Court finds a strong likelihood that they will succeed on their Contract Clause claim.

### 2.    Contract Clause Violation

Article I, section 10 of the United States Constitution provides that "No State shall . . . pass any . . . law impairing the Obligation of Contracts."  The Supreme Court has articulated a three-prong analytic framework for assessing a claim that the State has violated this clause.  *See, e.g., Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-13 (1983).  First, the court must "determine whether the complaining party has established that the challenged legislation in fact operates as a 'substantial impairment of a contractual relationship.' "  *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 323 (6th Cir. 1998) (quoting *Energy Reserves*, 459 U.S. at 411).  "A substantial impairment may exist even where there has not been a 'total destruction of contractual expectations.' "  *Id*. (brackets omitted).  "The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected."  *Energy Reserves*, 459 U.S. at 411 (citation omitted).

If the complaining party demonstrates "a substantial impairment of a contractual relationship," the burden shifts to the State to proffer "a significant and legitimate public purpose behind the regulation[.]"  *Id*. at 411 (citation omitted).  If such a purpose is identified, the court must ask "whether the adjustment of the

rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." *Id.* at 412 (internal quotation marks, brackets, and citation omitted).

Plaintiffs assert that PA 269 substantially impairs their labor contracts in which employers have agreed to provide payroll deduction for union SSFs. Sixth Circuit precedent in fact establishes that a State's prohibition of PAC check-off constitutes a substantial impairment of a pre-existing CBA requiring PAC check-off. *Pizza*, 154 F.3d at 323-24.

Defendants nevertheless contend that Plaintiffs fail to demonstrate a substantial impairment to an existing contractual relationship because they have not submitted for the Court's review any CBAs in their entirety and have included excerpts of only two contracts despite the fact that Plaintiffs include four unions and two union members, one of whom appears to be a member of a different local chapter not a plaintiff in this litigation. (Defs.' Resp. Br. at 26, ECF No. 18 at Pg ID 318.) Defendants further contend that the excerpts of the CBAs Plaintiffs provide do not detail any reimbursement provisions, the absence of which would render the PAC check-off requirement invalid under the version of the MCFA in effect when the contracts became effective. (*Id.*) Lastly, Defendants argue that PA

24

269, unlike the payroll deduction ban at issue in *Pizza*, does not expressly apply to pre-existing contracts.  (*Id*. at 27, ECF No. 18 at Pg ID 319.)

Defendants' arguments fail to convince the Court that the Sixth Circuit's holding in *Pizza* does not control this case.  The Court sees no reason for Plaintiffs to have submitted the entirety of every CBA at issue to demonstrate a likelihood of success on their Contract Clause claim.  In ERISA litigation, the parties frequently submit only the relevant portions of the CBAs to the Court, particularly as the contracts oftentimes are voluminous.  Plaintiffs have submitted sufficient evidence to show that labor contracts between at least two Plaintiffs (Local 223 and Local 58) and their members' employers contain promises by the employers to provide payroll deduction for the unions' SSFs.  There is no reason for Plaintiffs to submit the provisions of the CBAs containing reimbursement provisions, as those provisions are not at issue here.  Finally, PA 269 went into effect immediately and contains no provision suggesting that payroll deduction required under existing CBAs are excluded from its coverage.  By its express terms, PA 269 applies to pre-existing CBAs, just as the prohibition did in *Pizza*.

To justify the impairment of Plaintiffs' CBAs, Defendants set forth the same interests as they did in response to Plaintiffs' First Amendment arguments.  For the reasons discussed earlier, the Court questions the legitimacy of the purposes

asserted by Defendants.  As such, the Court concludes that Plaintiffs are likely to establish that PA 269 violates the Contract Clause

### B.   Irreparable Harm, Harm to Others & the Public Interest

The Court finds that Plaintiffs will suffer irreparable harm absent an injunction.  The Supreme Court has held that " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  Moreover, Plaintiffs establish that unions named in this lawsuit are losing substantial PAC contributions as a result of PA 269, which they cannot otherwise collect in time for the current election cycle.  Thus the statute is negatively impacting Plaintiffs' ability to fund their political activities this election cycle and thereby have their opinions heard.

As the Sixth Circuit indicated in *Bays*, " 'if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment.' " 668 F.3d at 825 (quoting *Deja Vu of Nashville, Inc. v. Metro Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)).  Finally, the *Bays* court also recognized that " 'it is always in the public interest to prevent violation of a party's constitutional rights.' " *Id.* (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)).

26

**IV.    Conclusion**

For the above reasons, the Court concludes that the balance of the relevant factors weigh in favor of the entry of a preliminary injunction.

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for preliminary injunction is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants, their agents, and anyone acting in concert or participation with them, are enjoined from taking any action to implement or enforce Michigan Compiled Laws Section 169.254(3), which prohibits a corporation from providing for the collection and transfer of contributions by its employees to their union's SSF, by payroll deduction.

s/ Linda V. Parker  
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: June 30, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, June 30, 2016, by electronic and/or U.S. First Class mail.

s/ Richard Loury  
Case Manager
